**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| LAWANDA FREDWELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:20-cv-206-MTS |
| | ) | |
| KILOLO KIJAKAZI, *acting commissioner of* | ) | |
| *the social security administration*, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court for review of the final decision of Defendant, the Acting

Commissioner of Social Security, denying the application of Lawanda Fredwell ("Plaintiff") for

Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C.

§ 1381, *et seq.* (the "Act").

I.     **Procedural History**

On November 27, 2017, Plaintiff filed an application for SSI with an alleged onset date of

November 27, 2017.[1]  (Tr. 211–216, 217–223).  After Plaintiff's application was denied on initial

consideration, she requested a hearing from an Administrative Law Judge ("ALJ").  (Tr. 10, 144–

45).  Plaintiff and her counsel appeared for an in-person hearing before the ALJ on November 15,

2019.  (Tr. 56–92).  In a decision dated December 11, 2019, the ALJ concluded Plaintiff was not

disabled under 42 U.S.C. § 1614(a)(3)(A).  (Tr. 17–35).  The Appeals Council denied Plaintiff's

request for review on July 29, 2020.  (Tr. 5–11).  Accordingly, the ALJ's decision stands as the

Commissioner's final decision subject to judicial review.[2]

---

[1] Plaintiff voluntarily amended her alleged onset date to November 27, 2017 at the ALJ hearing in November 2019.
[2] Section 1383(c)(3) of Title 42 provides for judicial review of the SSA Commissioner's "final decision."

II.        **Evidence Before The ALJ**

A.        **Overview**

Plaintiff was born on February 3, 1976 and was 41 years old on the alleged disability onset date.  (Tr. 23, 29, 242).  She completed school through the tenth grade.  (Tr. 29, 64–65).  She was last employed as a convenience store clerk, until she quit in July 2009.  (Tr. 66, 99, 103, 227–28, 231, 468, 643, 833).  Since her alleged disability onset date, Plaintiff acted as a primary caregiver for her teenaged daughter, (Tr. 262, 739), several family pets, (Tr. 387, 395, 528, 790), her elderly parents, and her boyfriend's elderly parents.  (Tr. 73-75, 396, 466, 523, 739, 817).  She also cared for her boyfriend's young niece "24 hours a day," while the niece was living with them on and off, from the time she quit her job in 2009 until about May 2019. (Tr. 74-75, 494, 600).  Plaintiff also attends to her two adult sons, during and between their incarcerations, (Tr. 389, 395, 474, 486, 605, 807), and assists with other family members and friends.  (Tr. 496, 768, 809).

B.        **Medical Evidence**[3]

Plaintiff's alleged onset date is November 27, 2017.  Plaintiff began counseling in February 2016 and medication management in May 2016.  (Tr. 665, 629).  In July 2017, Plaintiff endorsed continued anxiety, depression, anger, nightmares, paranoia, and auditory hallucinations.  Plaintiff admitted her triggers were people she felt were "acting stupid", and she would react by walking away.  She stated she had been experiencing nightmares for the past week.  (Tr. 395).  On August 28, 2017, Plaintiff presented to Dr. Linda Kohler for problems with memory causing increased anxiety and low energy.  (Tr. 402).

On March 27, 2018, Plaintiff met with Licensed professional counselor ("LPC") Tami Cox for a therapy assessment. (Tr. 466).  She explained experiencing childhood abuse and neglect, and

---

[3] While Plaintiff sought treatment for physical impairments throughout the record, the issue on appeal concerns only her mental impairments; therefore, the mental health treatment records will be the only records addressed here.

now acting as caretaker for multiple family members.  Plaintiff reported she could not work after being attacked by a customer in 2009 and enduring a physical and psychological injury.  Cox diagnosed Plaintiff with major depressive disorder, severe, with psychotic features.  On April 13, 2018, Plaintiff reported continued anxiety and depressive episodes, mostly due to environmental factors such as stressors related to her son and her boyfriend moving out.  (Tr. 472).  Plaintiff and Cox discussed how to handle stress and conflict at home.  On April 25, 2018, Plaintiff presented to Nurse Sheryl Teachenor for medication management.  (Tr. 561).  She appeared tearful, and reported depression, anxiety, and post-traumatic stress disorder ("PTSD").  Plaintiff endorsed recurrent nightmares, not wanting to go anywhere, not sleeping well, zero motivation, and low energy.  In May 2018, Plaintiff reported an increase in depressive symptoms and anxiety, and issues with her boyfriend and both her sons—one is incarcerated and the other struggles with substance abuse.  (Tr. 474).  On June 4, 2018, Plaintiff described feeling depressive symptoms that change daily.  (Tr. 476).  On June 21, 2018, Plaintiff reported anxiety symptoms and noted her daughter wrecked her car, causing legal and financial consequences.  (Tr. 478).

On July 9, 2018, Plaintiff reported that her boyfriend moved back into the house, that she lessened contact with her incarcerated son, that things were "going well," and that she was "feeling better."  (Tr. 480).  On July 26, 2018, Plaintiff reported financial and health concerns that were "causing anxiety," such as missing the Medicaid deadline and having to reapply.  (Tr. 482).

In August 2018, Plaintiff reported increased symptoms of depression and anxiety.  (Tr. 484, 488).  Plaintiff reported problems with her adult son, including his substance abuse and anger outburst; recently, the police were called in a dispute, and Cox recommended services to assure her safety.  Plaintiff reported symptoms of depression, anger, anxiety, and audio/visual hallucinations.  (Tr. 528–29).  Plaintiff explained having "bad days" and decreased motivation;

3

she also noted that counseling was helpful to learn to cope with stressful situations and work through problems, especially related to stressors with her children—a son who struggles with substance abuse, a son who is incarcerated, and a teenage daughter.  (Tr. 528–31, 551).  On September 14, 2018, Plaintiff endorsed issues related to anxiety attacks and depressive symptoms. (Tr. 490).  On September 28, 2018, Plaintiff reported being banned after verbally assaulting a nurse at her son's prison.  (Tr. 492).  She explained feeling very upset and angry about the situations and discussed impulse control.  On October 12, 2018, Plaintiff reported anxiety from taking care of her boyfriend's niece.  (Tr. 494).  On October 26, 2018, Plaintiff described feeling "very stressed out" from issues with her children, caretaking, and financial hardship.  (Tr. 496).

On October 31, 2018, Plaintiff met with Nurse Teachenor for medication management and reported not taking her medications because she did not know which ones to take; Plaintiff received a list to help her.  (Tr. 577).  She reported poor sleep and low energy.  On December 13, 2018, Plaintiff returned for medication management and reported taking her medications as prescribed and feeling better, despite low energy.  (Tr. 581–82).  On January 25, 2019, Plaintiff met with Physician Assistant ("PA") Daniel Beck for medication management and reported taking her medications as prescribed and feeling stable with controlled depression but persistent anxiety.  (Tr. 590).  Plaintiff described her anxiety as irritability.  PA Beck stated Plaintiff did not endorse symptoms consistent with generalized anxiety and changed her medications. (Tr. 590–92).

On February 4, 2019, Plaintiff told Cox she had anxiety symptoms related to environmental concerns, such as issues with her son who was then on probation.  (Tr. 504).  On February 18, 2019, Plaintiff reported several episodes of anxiety since her previous therapy session with Cox, and the two discussed challenging cognitive distortions that impacted mental health like catastrophizing and polarized thinking.  (Tr. 506).  On February 20, 2019, Plaintiff reported

compliance with medication and improved mood and anxiety but persistent racing thoughts and significant irritability. (Tr. 595–597). Plaintiff reported wanting better control of her symptoms and stated she was taking lorazepam as needed, which was one to two times per week. (Tr. 595). PA Beck continued Plaintiff's treatment plan but increased her rexulti. (Tr. 597).

On March 4, 2019, Plaintiff reported increased anxiety due to her son who had moved back into her house. (Tr. 508). On March 20, 2019, Plaintiff reported feeling depressed "sometimes" and increased irritability but no symptoms of mania. (Tr. 600). She explained that recently getting custody of her child had been stressful. PA Beck continued Plaintiff's treatment plan and recommended use of rexulti—which Plaintiff had stopped taking—for mood and anxiety. (Tr. 600–02). On March 21, 2019, Plaintiff reported anxiety symptoms that she related to environmental factors, including issues with her adult children, financial concerns, and issues with her boyfriend. (Tr. 510). On April 15, 2019, Plaintiff reported anxiety symptoms which she again related to environmental factors. (Tr. 512). Three days later, Plaintiff reported worse mood and significant agitation and irritability. (Tr. 605). PA Beck was unsure if these symptoms were due to mental disorders or social stressors but thought likely a combination of both. (Tr. 607). Plaintiff stated she was compliant with her medication and that her anxiety had been ok, but she constantly worried about her sons and being the caretaker of many family members. (Tr. 605). Plaintiff also reported difficulty sleeping; PA Beck prescribed trazadone for sleep. (Tr. 607).

On May 14, 2019, Plaintiff reported that her mental health had felt like a roller coaster, with both good and bad moments. (Tr. 803). She expressed feeling overly tired and stressed. Plaintiff endorsed crying often and feeling concerned about her children and other familial stressors. Plaintiff discussed coping practices and relaxations. On May 16, 2019, Plaintiff reported compliancy with medication and endorsed improved sleep and mood, with reduced symptoms of

5

irritability and anxiety.   (Tr. 758).   Plaintiff reported taking trazodone as needed, but her nightmares persisted, although she expressed some improvement with prazosin and trazodone. Plaintiff stated she stopped drinking caffeine and soft drinks, which caused some anxiety and headache.

On June 3, 2019, Plaintiff stated she was doing well with medication and reported her mental health had improved, especially since her kids were out of the house.   (Tr. 805).   On June 25, 2019, Plaintiff endorsed anxiety and nervousness and reported that her incarcerated sons were requesting money from her.   (Tr. 807).

On July 8, 2019 Plaintiff reported anger outbursts and ongoing symptoms and episodes of depression, which she attributed mostly to environmental concerns such as issues with her children, boyfriend, and finances.   (Tr. 782).   On July 12, 2019, Plaintiff reported good sleep and mood with no depression but mild anxiety due to having grandchildren in town.   (Tr. 763).   On July 22, 2019, Plaintiff reported ongoing anxiety episodes that she mostly attributed to environmental factors such as relationship issues with her boyfriend, both her sons' incarceration, and finances.   (Tr. 784).   On July 29, 2019, Plaintiff reported increased stress and anxiety, which she reported was mainly due to her home and family situation.   (Tr. 809).   Plaintiff also endorsed worries regarding finances, such as concerns about having enough money for "back to school" supplies for her daughter.   On July 31, 2019, Plaintiff expressed agitation due to her cousin and daughter moving in with her, along with other stressors.   (Tr. 768).   She explained losing her Vistaril and needing another prescription.   Plaintiff stated that her mood was bad, her anxiety was high, and that she had been getting angry and throwing things.   She admitted feeling dangerous and thinking more about suicide with a plan.   PA Beck reported Plaintiff's agitation, depression, and anxiousness, which "[a]ppear[ed] to be in response to social stressors."   (Tr. 771).   She referred

Plaintiff to the crisis staff.  (Tr. 768).  Plaintiff was not hospitalized, but a safety plan was completed.  (Tr. 774).

On August 5, 2019, Plaintiff reported increased anxiety and panic attacks which she related to economic problems, legal issues with her daughter, and communication problems with her boyfriend.  (Tr. 786).  On August 19, 2019, Plaintiff reported she was doing well mentally.  (Tr. 813).  Later that month, Plaintiff stated she was compliant with her treatment plan and reported her mood was improved, anxiety was minimal, and her sleep was good.  (Tr. 774).  She explained kicking everyone out of her home caused her stress level to reduce.  The next day, Plaintiff reported escalated symptoms of anxiety that she attributed mostly to environmental factors, including issues with her children and boyfriend, "caregiver burnout" with parents, poor condition of home, and her finances.  (Tr. 788).  On September 10, 2019, Plaintiff reported improvement of symptoms.  (Tr. 815).  A few weeks later, she endorsed increased stress and anxiety, especially related to caring for others.  (Tr. 817).

### C.    Medical Opinions

#### 1.    Dr. Robert Cottone's Opinion

In April 2018, Dr. Robert Cottone, a state agency psychological consultant, performed a mental assessment of Plaintiff.  (Tr. 123–27).  Dr. Cottone found Plaintiff had limitations with memory, completing tasks, concentration, following instructions, and getting along with others. He found Plaintiff was capable of understanding and remembering simple instructions; understanding, remembering, and carrying out simple and mildly complex instructions; making commensurate work related decisions; sustaining concentration, persistence and pace on tasks at that level; relating acceptably to others at a basic level, but would be best suited for a job with

moderately limited social demands; adapting to normal changes in a basic work routine. He concluded she should avoid public contact work.

### 2. Dr. Linda Kohler's Opinion

In June 2018, Dr. Linda Kohler, Plaintiff's treating physician, submitted a medical source statement regarding Plaintiff's condition. (Tr. 416–18). Dr. Kohler opined that Plaintiff's symptoms from anxiety, depression, and PTSD would cause bad days resulting in absenteeism. Through a series of checked boxes, Dr. Kohler opined that Plaintiff was unable to perform the following tasks on a regular and continuing basis: remember locations and work-like procedures; understand, remember, and carryout short and simple instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; complete a normal workday and workweek without interruptions from psychologically based symptoms and without an unreasonable number and length of rest periods; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; travel in unfamiliar places or use public transportation; respond appropriately to change in the work setting; and set realistic goals or make plans independently of others.

### 3. Dr. John Wood's Opinion

On November 4, 2019, Dr. John Wood performed a psychiatric evaluation of Plaintiff. (Tr. 827–34). He opined Plaintiff had problems with major depressive disorder. During the evaluation, Dr. Woods reported that Plaintiff exhibited only a "mild" amount of depression and "mild" reactive

emotional distress, which "apparently was due for having to come to [the] evaluation." The opinion noted Plaintiff appeared clean and neatly groomed, casually dressed, with appropriate hair and makeup. She was fully oriented, with normal immediate recall, the ability to spell "world" backwards, and without any evidence of hallucinations or delusions or homicidal or suicidal ideations. Plaintiff maintained good eye contact, clear speech, logical and coherent thoughts, as well as appropriate and congruent mood and affect, during the examination. Plaintiff scored 28 out of 30 on a Flostein Mini Mental Status Exam.[4] Dr. Woods diagnosed Plaintiff with recurrent major depressive disorder and PTSD. Dr. Woods found Plaintiff exhibited no more than "moderate abnormalities in her mental health functioning." He found she had a mental disability that prevented her from engaging in employment, and her incapacity would last for 13 months or longer, but this was dependent upon her compliance with medication and supportive therapy.

### D.    Hearing Testimony

Plaintiff testified at an ALJ hearing on November 15, 2019. Plaintiff reported she drove most days, but it depended on the day and her anxiety. (Tr. 65). She reported she did not feel comfortable in the community. (Tr. 72). She reported grocery shopping twice per month but always with someone else. (Tr. 83). Plaintiff discussed struggling with anxiety. She explained having good and bad days and said that on bad days she did not go outside. (Tr. 70, 86). Plaintiff reported panic attacks occurred one to two times per week lasting 25 minutes to two hours. Plaintiff reported her panic attacks that lasted over an hour occurred three to four times per month. (Tr. 86–87). She stated after a long panic episode she would need to decompress. Plaintiff stated her worry disrupts her ability to focus. (Tr. 87). Regarding her depression, Plaintiff reported feeling no motivation to do anything and going three to four days without showering because she

---

[4] A score of 23 or less would suggest the need for further assessment.

felt it was no use.  She stated she no longer cooked because there was no reason for it.  (Tr. 71).

Plaintiff explained her medications did not help with energy but therapy helped with day-to-day

stressors and problems.  (Tr. 72).  Plaintiff reported forgetting things constantly and struggling to

finish a task.  (Tr. 87).

An impartial vocational expert, Janice S. Hastert, also testified at the hearing and based on

a hypothetical, opined that someone like Plaintiff could work in unskilled jobs such as retail

stubber, circuit board laminator, and casting machine tender.  (Tr. 89–90).

**III.        Standard of Review and Legal Framework**

To be eligible for disability benefits, Plaintiff must prove that she is disabled under the

Social Security Act.  *Baker v. Sec'y of Health & Hum. Servs.*, 955 F.2d 552, 555 (8th Cir. 1992).

The Act defines a disability as the "inability to engage in any substantial gainful activity by reason

of any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than 12

months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  A claimant will be found to have a

disability "only if his physical or mental impairment or impairments are of such severity that he is

not only unable to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national

economy."  42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S.

137, 140 (1987).

The Social Security Administration has established a five-step process for determining

whether a person is disabled.  20 C.F.R. § 416.920(a)(4) (explaining the five-step sequential

evaluation process).  Steps 1-3 require the claimant to prove: (1) she is not currently engaged in

substantial gainful activity; (2) she suffers from a severe impairment; and (3) her disability meets

or equals a listed impairment. *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009); 20 C.F.R. §§ 416.920(b)-(d), 972(a), 974–975. If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to Steps 4 and 5. *Pate-Fires*, 564 F.3d at 942; *see also* 20 C.F.R. § 416.920(e). At this point, the ALJ assesses the claimant's residual functioning capacity ("RFC"), "which is the most a claimant can do despite her limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009); *see also* 20 C.F.R. § 416.920(e). The ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of her symptoms and limitations. *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005). At Step 4, the ALJ must determine whether the claimant can return to her past relevant work. 20 C.F.R. § 416.920(f). If the ALJ finds at Step 4 that a claimant cannot return to past relevant work, the burden shifts at Step 5 to the Administration to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. 20 C.F.R. §§ 416.920(g), 912, 960(c).

The court's role on judicial review is to decide whether the ALJ's determination is supported by substantial evidence on the record as a whole. *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007); *see also Bowman v. Barnhart*, 310 F.3d 1080, 1083 (8th Cir. 2002). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Id.* In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the ALJ's decision. *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has emphasized repeatedly that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010) (quoting *Howard v. Massanari*, 255 F.3d 577, 581 (8th Cir. 2001)). Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." *Id.*; *see also Stewart v. Sec'y of Health & Hum. Servs.*, 957 F.2d 581, 585–86 (8th Cir. 1992) (setting forth factors the court must consider). Finally, the court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence record. *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. *Id.*; *see also McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and even if [the court] may have reached a different outcome").

IV.     **The ALJ's Decision**

The ALJ's decision in this matter conforms to the five-step process outlined above. At Step 1, the ALJ found Plaintiff did not perform substantial gainful activity ("SGA") since the alleged onset date. (Tr. 23). At Step 2, the ALJ found Plaintiff had severe impairments of anxiety and depression. (Tr. 23–24). At Step 3, the ALJ found Plaintiff did *not* have an impairment or combination of impairments that met or medically equaled a statutorily recognized impairment.

(Tr. 24–25).  At Step 4, the ALJ found Plaintiff had the RFC to perform work with nonexertional limitations.  (Tr. 25–29).  In making this finding, the ALJ considered Plaintiff's symptoms using a two-step process[5] and concluded that Plaintiff failed to establish that her alleged symptoms completely limited work-related activities, namely because her complaints of the symptoms severity and limiting effects were inconsistent with the evidence of record.  (Tr. 25–26).  At Step 5, the ALJ considered Plaintiff's age, education, work experience, and RFC and found there were jobs in the national economy that Plaintiff can perform, despite her nonexertional limitations, such as a retail stubber, circuit board laminator, and casting machine tender.  (Tr. 30).  Therefore, the ALJ concluded that Plaintiff is not disabled.  (Tr. 31).

**V.**     **Discussion**

Two specific issues exist between the parties in this case.  First, whether the ALJ properly considered or discounted Plaintiff's subjective symptoms relating to her mental impairments of anxiety and depression.  Second, whether the ALJ properly assessed medical opinions.

### 1.   The ALJ appropriately addressed Plaintiff's subjective symptom allegations

Plaintiff argues the ALJ inappropriately discounted her subjective symptoms.[6]  The ALJ determined Plaintiff's statements regarding the intensity, persistence and limiting effects of her alleged symptoms were not entirely credible.  (Tr. 26).  The ALJ cannot discount subjective complaints solely because they are unsupported by objective medical evidence.  *Halverson v. Astrue*, 600 F.3d 922, 931–32 (8th Cir. 2010) (citing *Mouser*, 545 F.3d at 638).  However, the ALJ

---

[5] The ALJ found Plaintiff's medically determinable impairments could have reasonably been expected to produce her alleged symptoms; however, the ALJ found that Plaintiff's statements concerning the intensity, persistence and limiting effects of those symptoms are not credible to the extent they are not supported or consistent with the evidence of record.  (Tr. 26).

[6] For purposes of social security analysis, a "symptom" is an individual's own description or statement of his physical or mental impairments. SSR 16-3p, 2017 WL 5180304, at *2 (Soc. Sec. Admin. Oct. 25, 2017) (republished). If a claimant makes statements about the intensity, persistence, and limiting effects of his symptoms, the ALJ must determine whether the statements are consistent with the medical and other evidence of record. *Id.* at *8.

may discount complaints if they are inconsistent with the evidence as a whole. *Chaney v. Colvin*, 812 F.3d 672, 677–78 (8th Cir. 2016). The Court defers to the ALJ's credibility determination if it is supported by good reasons and substantial evidence. *Bryant v. Colvin*, 861 F.3d 779, 782–83 (8th Cir. 2017); *Fentress v. Berryhill*, 854 F.3d 1016, 1021 (8th Cir. 2017) (explaining that even if a claimant can point to some evidence which detracts from the Commissioner's determination, "good reasons and substantial evidence on the record as a whole support the Commissioner's RFC determination.").

The ALJ provided various reasons for finding Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were inconsistent with the evidence in the record as a whole. Specifically, that Plaintiff's subjective symptom allegations were inconsistent with her: (1) objective medical evidence, including the clinical findings during her mental status and other examinations; (2) treatment history, which involved no hospitalization or emergency room care; and (3) extensive activities of daily living and documented abilities throughout the relevant period. (Tr. 25–28).

First, the ALJ concluded that the severity and limiting effect of Plaintiff's asserted symptoms were "out of proportion" and "inconsistent" with the objective medical evidence of record. (Tr. 26–27). In making this determination, the ALJ points, in part, to a psychological examination by Dr. Wood. The ALJ determined that because Plaintiff "did not exhibit any evidence of hallucinations or delusions during the examination . . . [and] did not exhibit any evidence of significant anxiety or panic" that Plaintiff does not significantly suffer from those symptoms as alleged. (Tr. 26). However, a one-time consultative examination—a "snapshot in time"—cannot reduce the credibility of Plaintiff's subjective complaints of symptoms. *See Dace v. Saul*, No. 4:17-cv-01775-PLC, 2019 WL 4643976, at *11 (E.D. Mo. Sept. 24, 2019) (noting the

14

ALJ's reliance on a single treatment note "provides a snapshot of Plaintiff's mental status in June 2012, but is not a proper basis to determine Plaintiff's functional limitations."); *Shields v. Saul*, No. 2:19-cv-60-HEA, 2020 WL 6314636, at *15 (E.D. Mo. Oct. 28, 2020) ("The Court agrees that "[m]ental illness is episodic by nature . . . and an individual can have good days and bad days, such that a snapshot of any single moment may indicate little about the individual's overall condition." (internal quotations and alterations omitted)).  Thus, the ALJ improperly based the decision on such a reading of the record; rather, the ALJ should have considered Plaintiff's level of functioning over time.  *Frederick v. Berryhill*, 247 F. Supp. 3d 1014, 1022 (E.D. Mo. 2017) ("Given that a claimant's level of mental functioning may seem relatively adequate at a specific time, proper evaluation of the impairment must take into account a claimant's level of functioning 'over time.'").

Although the ALJ drew erroneous inferences from Dr. Wood's report, such mistake does not necessitate reversal here because other, substantial evidence in the record supports the ALJ's determination, even in the absence of the ALJ's inference.  *Chaney*, 812 F.3d at 677 (citing *Ford v. Astrue*, 518 F.3d 979, 983 (8th Cir. 2008)) ("When an ALJ draws erroneous inferences from the record, this Court will reverse if the record does not weigh so heavily against the claimant's credibility that the ALJ would have necessarily disbelieved the claimant absent the errors drawn from the record.").  Most notable, Plaintiff's mental health providers generally noted she was fully oriented, with fair to good attention and concentration, intact memory, without suicidal ideations or psychosis, exhibited proper hygiene and often with a normal or appropriate mood and affect. (Tr. 475, 595–96, 753–53, 755–56, 760-61, 385, 387, 389, 391, 393, 469, 475, 476–77, 479, 528, 530–31, 565–67, 605, 607–08 630, 632, 634, 636, 667, 670, 760–61, 774–76, 795–96). Additionally, longitudinal records by providers noted that Plaintiff was well-developed, well-

nourished, in no distress, with normal mood, affect, behavior, and thought content.  (Tr. 324, 327, 330–31, 334–35, 338–39, 377, 382, 403, 428, 447, 452, 679, 683–84).  Thus, the inconsistencies between Plaintiff's alleged extreme symptoms and her generally and consistent normal clinical findings is a reasonable basis to discount her subjective statements.  *Adamczyk v. Saul*, 817 F. App'x 287, 291 (8th Cir. 2020) (discounting a claimant's subjective statements, in part, based on consistent medical reports noting well-groomed, clear speech, linear thought process, cognition and memory intact, and ability to follow and engage in appropriate conversation); *Goff*, 421 F.3d at 792 (holding proper the ALJ's consideration of unremarkable or mild objective medical findings as one factor in assessing credibility of subjective complaints).

Plaintiff argues that the ALJ underplayed the severity of Plaintiff's depression and anxiety based on its unfounded belief that her symptoms were purely situational.  However, this argument lacks merit.  The ALJ made just one statement in the decision regarding situational stressors effect on Plaintiff's mental health.[7]  (Tr. 27).  Moreover, the ALJ did not attribute *all* her symptoms solely to situational stressors; rather, the opinion noted that her ongoing symptoms were largely a result of those stressors.  The ALJ may consider mental symptoms that are "situational in nature" when determining disability.  *Gates v. Astrue*, 627 F.3d 1080, 1082 (8th Cir. 2010).  And, substantial evidence supports the ALJ's inference that Plaintiff's symptoms are largely caused or exacerbated by situational stressors, including from evidence of statements by medical providers and Plaintiff herself.  *See* (Tr. 774) (describing how Plaintiff "kicked everyone out her house, which relieved most her stress"); (Tr. 786) (reporting increased anxiety, including panic attacks, which Plaintiff attributed to "environmental factors" including, economic problems, legal issues with her juvenile daughter, and communication problems with boyfriend); (Tr. 784) (reporting

---

[7] "The claimant reported ongoing symptoms to her providers, but she generally noted that they were caused by relationship and situational stressors dealing with family issues" (Tr. 27).

ongoing anxiety episodes Plaintiff mostly attributed to relationship issues with her boyfriend, her adults sons' incarceration, and her finances); (Tr. 817) (endorsing increased stress and anxiety, especially related to caring for others); (Tr. 788) (reporting escalated symptoms of anxiety Plaintiff attributed mostly to issues with children, relationship problems with boyfriend, "caregiver burnout," poor condition of home, and finances); (Tr. 782) (attributing her anger outbursts, ongoing depressive symptoms, and episodes of anxiety mostly to issues with her children, boyfriend, and finances); (Tr. 771) (opining that Plaintiff's current agitation, depression, and anxiousness appeared "to be in response to social stressors."); (Tr. 512) (reporting anxiety symptoms Plaintiff related to "environmental factors"); (Tr. 510) (same); (Tr. 504) (same); (Tr. 488) (same); (Tr. 472) (same).

Plaintiff also argues that the ALJ improperly overlooked her 2019 ALJ testimony relating to panic attacks, ones that Plaintiff reported last 25 minutes to two hours and occurred twice a week. Yet, the ALJ did consider Plaintiff's reported panic attacks but noted the inconsistency of her report with the record. Namely, the record was devoid of diagnoses related to panic attacks and contained very limited subjective complaints throughout the record related to panic attacks. (Tr. 786, 831). Thus, the ALJ adequately identified inconsistencies that detracted from Plaintiff's credibility based on the evidence as a whole. *See Halverson*, 600 F.3d at 931–32 ("Another factor to be considered is the absence of objective medical evidence to support the complaints, although the ALJ may not discount a claimant's subjective complaints solely because they are unsupported by objective medical evidence."); *Casey v. Astrue*, 503 F.3d 687, 697 (8th Cir. 2007) ("[T]he RFC is ultimately a medical question that must find at least some support in the medical evidence in the record."); *Goff*, 421 F.3d at 790 ("A disability claimant has the burden to establish her RFC.").

17

With that said, the Court does recognize the "instability of mental impairments and their waxing and waning nature after manifestation." *Lillard v. Berryhill*, 376 F. Supp. 3d 963, 984 (E.D. Mo. 2019). Indeed, a review of Plaintiff's medical records reveal that, while her symptoms waxed and waned—including low energy and motivation, anxiety, panic attacks, nightmares, flashbacks, and feeling stressed—the bulk of the objective medical evidence, as the ALJ pointed out, shows Plaintiff more typically presented without debilitating symptoms, as discussed *supra*. Also, of note, is that Plaintiff does not present a case where her mental impairments once *did* cause permanently debilitating effects and that now, her symptoms are better. *Andler v. Chater*, 100 F.3d 1389, 1393 (8th Cir. 1996) ("It is inherent in psychotic illnesses that periods of remission will occur, and that such remission does not mean that the disability has ceased."). Rather, the ALJ's conclusion focuses on the lack of evidence showing that Plaintiff did, or ever had, symptoms so severe and limiting that she had no ability to work. Thus, the ALJ properly concluded that "other than [Plaintiff's] subjective reports, there is little evidence to support the severity and degree of limitation the claimant asserts." (Tr. 27); *Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001) (explaining that a claimant bears the burden of showing a severe impairment significantly limits her ability to perform basic work activities); *Ramirez v. Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002) ("While Claimant correctly asserts that an ALJ may not disregard subjective pain allegations solely because they are not fully supported by objective medical evidence, an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary.").

Second, the ALJ found Plaintiff's level of mental health treatment was "not reflective of her having disabling limitations." (Tr. 27). The ALJ noted Plaintiff engaged in regular medication management and received therapy and case management. The ALJ described Plaintiff's care as

"conservative" in nature, and Plaintiff does not appear to contest this characterization.  Rather, Plaintiff takes issue with the ALJ's conclusion that any increases in Plaintiff's symptoms were "short lived and not relatively significant." (Tr. 27).  In making this statement, the ALJ pointed to the "one occasion" when Plaintiff received crisis services, which required no hospitalization, and soon after, Plaintiff reported having a "stable" mood that was "much better," with "minimal" anxiety, and that she was sleeping well.[8]  (Tr. 27, 739–42, 774–76).  Plaintiff objects to the ALJ's reliance on the fact that Plaintiff did not require any emergency room or inpatient care for her mental health during this crisis or at any other times.  Indeed, Plaintiff is correct that the law does *not* require an individual to seek emergency room treatment for her allegations to be supported by the record.  *See Bland v. Saul*, 2020 WL 1929786, at *8 (E.D. Mo. April 21, 2020) (finding the ALJ erred by discounting disabling evidence because Plaintiff was never hospitalized or needed emergency treatment because "[a] claimant is not required to be hospitalized to be found disabled" (*citing Reed v. Barnhart*, 399 F.3d 917, 923 (8th Cir. 2005).  However, the ALJ emphasized the fact that Plaintiff never required any intensive treatment to support its inference that Plaintiff underwent routine and conservative treatment, which is inconsistent with disabling symptoms. *Moore*, 572 F.3d at 525 (upholding ALJ's analysis of finding, in part, that relief from conservative treatments were inconsistent with allegations of disabling symptoms); *Mabry v. Colvin*, 815 F.3d 386, 392 (8th Cir. 2016) (finding lack of hospitalization weighs against severity of symptoms).  Thus, the ALJ reasonably found Plaintiff's level of treatment was inconsistent with her allegations of disabling limitations. *See Milam v. Colvin*, 794 F.3d 978, 985 (8th Cir. 2015) (holding that ALJ

---

[8] Further, the provider noted Plaintiff's symptoms were largely alleviated by a change in her environment, without the need for a change in her treatment protocol.  (Tr. 774, 777).  It was proper for the ALJ to discuss this when determining the severity of Plaintiff's symptoms.  *Kisling v. Chater*, 105 F.3d 1258 (8th Cir. 1997) ("Impairments that are controllable or amenable to treatment do not support finding of disability."); *Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir. 2009).

properly considered claimant's relatively conservative treatment history when evaluating credibility); *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (noting the ALJ may consider a plaintiff's conservative course of treatment as indicative that his symptoms are not disabling); *Vanlue v. Astrue*, No. 4:11-cv-595-TIA, 2012 WL 4464797, at *12 (E.D. Mo. Sept. 26, 2012) (affirming the ALJ's finding that depression was not a severe impairment where the claimant had sought only conservative treatment and had never required more aggressive forms of mental health treatment).

Third, the ALJ found that Plaintiff's daily actives were inconsistent with her allegations of disabling symptoms causing work-preclusive limitations. Most notable, Plaintiff acted as a caretaker to several people. Plaintiff testified that she started caring for her boyfriend's niece, who had been living with her for an extended period, when the child was a newborn. She testified it was a "24-hour a day job" to care for this young child, basically from May of 2014 or 2015 through May of 2019. Based on this evidence, it was reasonable for the ALJ to discount Plaintiff's reports of disabling symptoms. *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018) (reasoning "the record overwhelming supports the determination that [Plaintiff was] not disabled" when he was a stay-at-home father, who, among other things, cared for several young children and maintained the family home).

In addition to caring for many people, the ALJ noted Plaintiff was able to maintain her driver's license, go shopping, prepare simple meals, and clean her home. Plaintiff also reported having no problems tending to her personal hygiene, fishing, riding a motorcycle, barbecuing on "good days," gardening, going out to play bingo once a week with her mother, using social media, and playing the "angry birds" video game. Plaintiff argues that the ALJ failed to acknowledge Plaintiff's limitations in performing these activities. For example, although Plaintiff prepared

meals, Plaintiff explained these meals were quick and easy such as frozen dinners, sandwiches, or macaroni and cheese. And although Plaintiff shopped, she did not go out alone and only went shopping once or twice a month. Despite these functional limitations, the ALJ reasonably found that Plaintiff "is more active than would be expected if all of her allegations were consistent with the record," (Tr. 27), and properly concluded Plaintiff can do limited work. *See Thomas v. Berryhill*, 881 F.3d 672, 676 (8th Cir. 2018) (reasoning that caring for a young child, preparing meals, doing housework, shopping, and driving a car when necessary, among other things, "showed that [a claimant] could work"). Additionally, the ALJ appropriately evaluated Plaintiff's subjective complaints by finding them inconsistent with her daily activities. *Adamczyk*, 817 F. App'x at 291 (explaining that inconsistencies between a claimant's statements regarding their daily activities and their claimed limitations are one potential ground for discrediting such statements); *Roberson v. Astrue*, 481 F.3d 1020, 1025 (8th Cir. 2007) (holding that the ALJ properly assessed a claimant's credibility when it considered the fact that the claimant took care of her eleven-year-old child, drove her to school and did other driving, fixed simple meals, did housework, shopped for groceries, and had no difficulty handling money). No one disputes that Plaintiff faces impairments. But it is implicit in the ALJ's disability-evaluation scheme that even someone with "severe physical and mental impairments" may "nonetheless [be] able to work." *Thomas*, 881 F.3d at 676 (citing *Onstad v. Shalala*, 999 F.2d 1232, 1233, 1235 (8th Cir. 1993)).

Finally, and despite the Court concluding that the ALJ properly evaluated Plaintiff's credibility, the ALJ *did* consider Plaintiff's subjective complaints, which are reflected in the RFC assessment limiting her to a range of simple work to accommodate her mental impairments. As an example, the ALJ acknowledged that Plaintiff's impairments at times caused some deficits in

her attention and concentration;[9] thus, the ALJ limited her work to "uninvolved instructions in the performance of simple, routine, and repetitive tasks."  Plaintiff also struggles with social interaction, so the ALJ limited her work to "no interaction with the public" and "occasional interaction with coworkers."

For these reasons, the Court finds that the ALJ's evaluation of Plaintiff's subjective complaints are supported by good reasons and substantial evidence in the record as a whole, consistent with applicable regulations and case law.

2.  **The ALJ Properly Considered The Medical Opinions**,

Plaintiff argues that the ALJ erred in its assessment of medical opinions.  The ALJ found persuasive the opinion of Dr. Cottone, a state agency psychological consultant, and found unpersuasive the opinions of Dr. Kohler and Dr. Wood.

For the same reason the ALJ found Dr. Cottone's opinion persuasive, it similarly discounted Dr. Kohler's opinion, Plaintiff's treating physician.  The "Commissioner may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence."  *Fentress*, 854 F.3d at 1020.  The ALJ found Dr. Cottone's opinion persuasive because it is supported by a detailed narrative explaining the evidence relied on in making the determination.[10]  In contrast, Dr. Kohler's opinion did not provide a detailed narrative to support her opinions and did not discuss the evidence on which she relied in making her determination.  Rather, Dr. Kohler's opinion consists of "checked boxes" and circled answers opining that Plaintiff had moderate to marked limitations in several areas of mental

---

[9] Plaintiff's difficulty maintaining attention and concentration is a non-exertional limitation. 20 C.F.R. § 416.969a(c)(1)(ii).
[10] Plaintiff does not take issue with the ALJ's analysis of Dr. Cottone's opinion.

health functioning, such as concentration, social interaction, and adaptation.[11]   Assessments possess little evidentiary value when they consist of nothing more than vague, conclusory statements—checked boxes, circled answers, and brief fill-in-the-blank responses—and cite no medical evidence and provide little to no elaboration. *See Thomas*, 881 F.3d at 675.  On that basis alone, the ALJ did not err in discounting Dr. Kohler's opinion and relying more heavily on Dr. Cottone's opinion.  *Id.*; *see also* 20 C.F.R. § 416.927(c) (evaluating opinion evidence); SSR 96–2p ("In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources.").

Additionally, the ALJ determined that the persuasiveness of the medical opinions hinged on consistency, or lack thereof, with treatment notes of record.  "If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007).  The ALJ found Dr. Cottone's opinion persuasive on the basis that it is supported by the mental status findings in the record.  In his psychological evaluation report, Dr. Cottone found Plaintiff had limitations with memory, completing tasks, concentration, following instructions, and getting along with others.  Despite these limitations, he concluded Plaintiff was able to understand and remember simple instructions and to sustain concentration and persistence with simple tasks.  Dr. Cottone also found moderate limitations in Plaintiff's ability to interact socially and no limitations in her ability to adapt to normal changes in a basic work routine.  The ALJ found Dr. Cottone's opinions consistent with the objective medical evidence that Plaintiff's symptoms of depression and anxiety created some

---

[11] Dr. Kohler also opined, without providing details or citing medical evidence, that Plaintiff has not been capable of performing competitive work on a regular or continuing basis.  But a "physician's opinion that a claimant is incapable of gainful employment is often not entitled to significant weight." *Fentress*, 854 F.3d at 1020.

deficits, but none significant. *Kamann v. Colvin*, 721 F3d 945, 951 (8th Cir. 2013) (finding that a state agency psychologist's opinion supported ALJ's finding that claimant could work despite his mental impairments); *Casey*, 503 F.3d at 694 (finding ALJ did not err in considering a state agency psychologist's opinion along with the medical evidence as a whole). In contrast, the ALJ found Dr. Kohler's opinion not persuasive because her opinion of disablement was inconsistent with treatment notes which indicated few deficits in Plaintiff's mental health functioning. In particular, Dr. Kohler's opinion was inconsistent with Plaintiff's mental status examinations, which consistently indicated that Plaintiff was fully oriented, with fair to good attention and concentration, intact memory, without suicidal ideations or psychosis, and often with a normal or appropriate mood and affect. Thus, the ALJ properly determined that Dr. Kohler's opinion—that Plaintiff had disabling work-related limitations—was not entitled to controlling weight because it was inconsistent with the record evidence as a whole.[12] *Davidson v. Astrue*, 501 F.3d 987, 991 (8th Cir. 2007) (finding inconsistency with other evidence alone sufficient to discount a treating physician's RFC); *Howe v. Astrue*, 499 F.3d 835, 840–41 (8th Cir. 2007) (finding the ALJ properly discounted a treating physician's opinion when the opinion conflicted with the record as a whole).

As to Dr. Wood's opinion, the Court agrees with the ALJ that there was little reason to find his statements on Plaintiff's disability persuasive.[13] Dr. Woods opined that Plaintiff's mental disability prevented her from engaging in employment. Such a statement does not constitute a "medical opinion" because it is a judgment about the nature and severity of Plaintiff's impairment. 20 C.F.R. § 416.913(a)(2) (defining "medical opinion"); 13 C.F.R. § 416.913(a)(3) (explaining that a medical opinion does not include judgments about the "nature and severity" of an

---

[12] It is worth mentioning that Dr. Kohler's opinion was conducted in the same time period as Dr. Cottone's opinion, within three months of one another.

[13] Plaintiff does not explicitly contest the ALJ's decision to discount Dr. Wood's opinion, however, Plaintiff regularly states that "two medical providers opined disabling limitations," which does include Dr. Wood.

individual's impairments, medical history, clinical findings, diagnosis, response to prescribed treatment, or prognosis).  Rather, such an opinion is reserved for the Commissioner.  20 C.F.R. § 416.920b(c)(3).  Thus, the ALJ properly discounted Dr. Wood's opinion regarding Plaintiff's ability to work. 20 C.F.R. § 416.920b(c) (requiring no analysis of evidence that is inherently neither valuable nor persuasive, such as assertions of "disability" reserved to the Commissioner); *Brown v. Astrue*, 611 F.3d 941, 952 (8th Cir. 2010).

CONCLUSION

For the foregoing reasons, the Court finds that the ALJ's determination is supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**.

A separate Judgment shall accompany this Memorandum and Order.

Dated this 26th day of January 2022

_____
MATTHEW T. SCHELP
UNITED STATES DISTRICT JUDGE